## Case No. 7,344.

### The JOHN GILPIN.

[Blatchf. Pr. Cas. 661.] [1]

Circuit Court, S. D. New York. Nov. 7, 1863. [2]

NELSON, Circuit Justice. This vessel, with her cargo, consisting of cotton and stores, was captured about the 25th of April, 1862, in the port of New Orleans, by gunboat No. 8, of Captain Farragut's fleet, after the taking of the city of New Orleans. The proceedings against the vessel were suspended in the court below, and a decree of condemnation was rendered against the cargo as enemy property. [Case No. 7,343.]

The claimants are the Weymouth Iron Company, a corporation of the state of Massachusetts. It appears from the test oaths that, in the latter part of 1860, this company shipped large quantities of nails manufactured by them, which were consigned to a house in New Orleans for sale on commission. The shipment was at their risk; the sale was to be made on their account, and the proceeds were to be remitted. At the breaking out of the war, a large stock of these nails, unsold, remained in the hands of the agent. After the disturbances of the war, the article being unsalable, the agent, Mr. Baldwin, exchanged the nails for the cotton, which was put on board of the schooner with the intent to ship the same, as the proceeds of the nails, to the owners in Massachusetts. The original design was to get access to the blockading squadron, and obtain permission to send the proceeds home; but, access for that purpose not having been obtained previous to the capture of the city, the vessel remained at her wharf, and was there found under the circumstances stated, where she was seized, as already mentioned, as prize of war. It further appears from the test oaths that the agent had much difficulty in preventing the property from being seized by the enemy, and had to resort to various devices to conceal and preserve it for the owners. The precise time when the exchange of the nails for the cotton took place in New Orleans does not appear. It

1 [Reported by Samuel Blatchford, Esq.]
2 [Reversing Case No. 7,343.]

is, however, fairly to be inferred from the proofs, that it was as early as June, 1861, and prior to the proclamation of the president prohibiting commercial intercourse with the enemy, in pursuance of the act of July 13, 1861 [12 Stat. 257], which proclamation was issued on the 16th of August following.

I have had before me heretofore the question involved in this case, and came to the conclusion that a citizen temporarily residing in the enemy's country at the breaking out of the war was entitled to a reasonable time to collect his effects and convert them into available and manageable funds, so as to enable him to withdraw them from the country. The whole transaction in this case seems to have been an honest and bona fide effort for this purpose. The case, as it stands upon the proofs, is a meagre one. But one witness on board of the vessel, the mate, was examined in preparatorio, and none of the ship's papers are produced. Their absence and also the absence of the other hands on the vessel are sought to be accounted for by the confusion and disorder that reigned in the city at and after the capture.

The only question is, whether or not the cotton, under the facts and circumstances stated, was enemy property. There is no question of blockade. The vessel and cargo were, at the time of capture, waiting at the wharf with a view to obtain permission for a lawful voyage, that the proceeds of the nails might be sent home. I cannot think that they should be regarded as enemy property, and must, therefore, reverse the decree below, and direct one to be entered for the claimants dismissing the libel.